Chief Justice Robertson
delivered the Opinion of the Court..
The plaintiff in error asks the reversal of a judgment for costs and nominal damages, obtained against him, by the defendant in error, on an issue involving her liberty or slavery, in an action of trespass, which, for trying her claim to freedom, she had instituted in consequence of his claiming her to be his slave, and exercising over her the dominion of a master.
Two depositions having been read on the trial, tending to prove, that the defendant was bom in Pennsylvania, since the year 1780; that she had been brought to-Kentucky in 1797 or 8, and had, about the year 1804,. been sold as a slave to one John Courtney, and had ever since been held and treated as a slave; and the statute of 1780 of the state of Pennsylvania, for the prospective abolition of slavery, having been also read, as evidence — the Circuit Judge refused, on the motion of the plaintiff in error, to instruct the jury to disregard certain' portions of the depositions; or to instruct them that-length of servitude created the presumption of slavery, and that the color of the defendant, also, was prima facie' evidence of her being a slave; but told them, that if, upon their own view, they should be of the opinion, that she was a white woman, they should find for her; and afterwards overruled a motion for a new trial.
These several opinions of the Circuit Court are now complained of as erroneous; and no other errors are suggested.
The points thus raised, will be considered in the order in which they have been presented.
First. The portions of the depositions which were objected to, were declarations óf opinion as to the iden *383 tity of the defendant with a female born in the family •of one McKee, and as to her being free, and recitals of what McKee had said about having gone once to Kentucky to reclaim her, and of the reasons he assigned for not taking her back with him, to Pennsylvania.
A person leaves a¡0f of hisdauahter, who holds until^he is'sold by the daughter, hez^ftha^ln the girl's suit for free-rations of thefa?s, t0 „the girl’srighttofreedom,made before *]j® the girl as his a^ersdy to are evidence ad^oraíysubsequent purchaser,
Personal identity, like handwriting, is matter of opinion ■or belief, founded on facts which may be, and frequently ■■are, inexplicable and incommunicable to a stranger; , , . . and therefore, as to such a tact, opinion is competent evidence.
The opinion respecting the defendant’s being free, was a deduction from the facts suggested by the wit- , . . . - , . , , , , „ nesses, the chiei oí which was, that she was born free, or was born since 1780; and, as the facts stated authorized the deduction, there was nothing in this part of the ■depositions which was inadmissible or illegal.
Nor should the declarations of McKee (the father of the witness) be deemed incompetent or, prejudicial. As his daughter, who had brought the defendant to Kentucky, and was then in the possession of her, did not pretend to have any other claim or title than that which she seemed to assert as his bailee, under authority, either delegated by him, or assumed by her as his daughter — ' whatever claim or title existed should be presumed to 'have been his when he returned to Pennsylvania from .... . ,, . his temporary sojourn m this state, and made the decíarations respecting the defendant and her rights, the proof •of which, in one of the depositions, has been objected to as inadmissible. On this ground alone, we should be •of the opinion, that the motion to reject this portion of the depositions was properly overruled. As Courtney ■claimed as a purchaser, from McKee’s daughter, or her husband, after the declarations which have been detailed in the depositions were made by McKee, who was then the owner, if any person was the owner, of the defendant, those declarations, which would have been admissible as evidence against McKee, or his son-in-law, holding under him without title, and not, as we presume, adversely, were equally admissible against the subsequent vendee, and, of course, against the plaintiff in error.
A motion was made to exclude •evidence, as incompetent, and •overruled: a part of it being admissible, though a part was not, the decision is sustained.
•It is a general rule, that quiet possession for 30 years (or even less) in the absence of countervailing circum■•stanccs, creates a presumption of title; butthis rule does not applyto the possession of a person held in slavery, because of the disability Incident to that condition. Prescription alone is not evidence— and at best, but a slight circum-stance, in aid of •other facts, to prove a person a ■slave. Videpost S>p. 387 — 9. j
What McKee said respecting documentary evidence of the defendant’s right to freedom, was not strictly admissible, because the written memorial, if it did exist, would be evidence of a higher grade, and its non-production has not been satisfactorily accounted for. But the Court was requested to exclude, not this isolated statement, but all that McKee had said: and, in this comprehensive and indiscriminat-ing form, the motion was untenable.
Second. Nor did the Circuit Judge err in refusing to instruct the jury, that they should presume that the defendant is a slave, from the fact that she had been held as such for more than thirty years.
It is an established and useful general rule, that an undisturbed dominion and possession for a period so long, or even not quite so long, will, in the absence of any countervailing circumstance, create a presumption of title. But this rule, fixed and general and salutary as it may be, does not properly apply to a question of slavery. Actual slavery is a disability even greater than that of infancy or coverture, and is surely entitled to, at least, as much indulgence and protection. A person held and governed as a slave, is not either physically or intellectually a free agent. It would be unreasonable, therefore, to make the fact of constrained submission, however protracted, proof that it was rightful.
Prescription alone cannot be proof of slavery, — and if it be entitled to any influence, it can only be that of a slight circumstance, corroborative, or rather illustrative, in a remote degree, of a more decisive fact, such as color, or reputation as to maternity. In Hudjins vs. vs. Wrights, 1 H. & M. Va. Repts. 141, the Court of Appeals of Virginia went even farther, and intimated that prescription is no evidence at all of slavery.
But could duration of servitude be entitled to any influence in this case, it is repelled by opposing facts. The evidence tends to prove: first, that the defendant was born in Pennsylvania, since the abolition statute of 1780 took effect, and that therefore, as decided in the case of Barrington vs. Logan, 2 Dana, 432, she was born free, even though her mother may have been a slave; *385 second, that when she was born, her mother was only an indented servant; and third, that Courtney declared, in effect, not four years prior to the commencement of this suit, that the defendant was entitled to be free.
All persons of blood not less than, i African, are (in Va. and T&.y.)prima facie deemed slaves.; and, e converso, whites .and those less than i, African, are, prima facie, free. All negroes are deem ed slaves; all whites and Indians free, when, their color is the only evidence.
The description pereoTof^colo* in his declaration Rie^andlTno'estoppdl. a^mtfor freedom, is per--the jmyAhathis ,c°]or may be escanse, the jury are to make their ©wn deductions from the inspection; the judge should not decide upon the color, and instruct,peremptorily, that it is prima facie evidence of freedom, or slavery. The instruction should he hypothetical — that, if the jury conclude upon their view, that the party is white, they must find for him, unless there is some other evidence ©f his being aslave; and', on the ether hand, if they find him colored (i ormore, African) they mast find against him — unless there is- other evidence of his freedom.
*385 We are, therefore, clearly of the opinion that .the second instruction was properly overruled.
Third. It has been -authoritatively adjudged that, on a question of liberty or slavery, in Virginia, where slavery is legalized, a black or mulatto complexion is prima facie evidence that the person of such color is a slave; because, in Virginia, whence our domestic slavery chiefly sprang, all negroes, muiattoes and moors, excepting Turks and Moors in amity with Great Britain, were, from about the year 1620 to that of 1778, declared to be slaves; — and'because, -as to slaves, partus sequiiur ventrem is the established rule.
Therefore, being a mulatto, -or having at least one fourth of African blood, has been held, in Virginia and in Kentucky, to be presumptive evidence of being a slave. And, e converso, it has been as well settled, that being a white person, or having less than a fourth of African blood, is prim a facie evidence of freedom. The rule is, that a person visibly a negro, is prima facie a slave; but that one apparently a white person or an Indian, is prima facie free: for as to Indians — though it was declared, by a Virginia statute of 1679, that Indian captives, and, by a statute of 1682, that Indians sold as slaves by their neighboring tribes, should be deemed to be slaves — those enactments were constructively repealed by an act of the Virginia Legislature of 1691, for encouraging a free trade among the Indian tribes.
Now, there having been no positive proof of the defendant’s color, except that which her actual appearance before the jury may have furnished, the Court certainly did not err in refusing to instruct them peremptorily that her color was prima facie evidence of her being a slave, It is true that, in the declaration, she is described as a ■person of -color; but such description merely was -not -material to her right, or to her cause of action, and was therefore intraversable, and could -not -operate as an estoppel; and if it should have-operated, even so far as to *386 have thrown the onus on her, it was proper, nevertheless, for the Court to withhold the instruction for two reasons: first — because she had proved facts conducing strongly to show that she is a free woman; and second — because the jury had a right to regard the evidence of their own eyes, on inspection in court; and therefore, the Court would have had no right to assume, that she was a negro or mulatto, and thereupon instruct the jury, that her color was evidence of her being a slave; hut did right in telling them, that, if they should, on their own view, believe that she was not a white woman, then prima facie, or in the absence of any opposing evidence, she was a slave.
The highest and the best evidence that can be given to a chancellor, or to a jury, is the evidence of his or their senses —as where, in a suit involving the freedom or slavery of a party, he stands identified before a jury, they can have no better evidence of his color.
But the counsel for the plaintiff in error, with much plausibility and force of argument, insists that the Circuit Judge erred in instructing the jury, that if, on inspection, they should be of the opinion, that the defendant was a white woman, they should find for her; and two objections have been urged to this branch of the hypothetical instruction: first-J 1 - -the counsel denies that personal inspection by the jurors, on the trial, is proper or allowable evidence; second — he insists that, even though the defendant should be deemed to be white; still she may be a slave; and that his client had proved facts tending to show that, whatever her color might appear to be, she is a slave; and that, therefore, as the Court denied to the jury the right to -consider all the facts, the-instruction was erroneous.
The first objection has already been disposed of, but, as it involves a question of some novelty, as well as of great importance in practice, some further notice of it may be proper.
To a rational man of perfect organization, the best and highest proof of which any fact is susceptible, is the evidence of his own senses. This is the ultimate test of truth, and is therefore the first principle in the philosophy of evidence. He who denies or doubts the evidence of his own proper senses, will, of course, deny or doubt the existence of matter, and be an universal sceptic; and to such a mind, there can be no such thing as proof; for if he- distrust his own senses, he will be much more distrustful of the testimony of others, as to> *387 the evidence of their senses. Hence cmtopsy, or the evidence of one’s own senses, furnishes the strongest probability, and indeed the only perfect and indubitable certainty, of the existence of any sensible fact.
ly white, may A white person ofunmixedblood cannotbeaslave; but one apparent-have a taint of African blood, and be a slave; and evidence of such taint, is admissible, even where a jury, upon their view, would decide, that the person was white; and instructions, ■that if, on inspection, they believe him white, they must find him free, would be errroneous. They must consider the whole evidence.
But we are compelled to depend on an inferior grade ■of evidence — the testimony of others — respecting facts of which we can have no personal knowledge. And jurors, selected and sworn to try facts litigated in court, are generally in this condition. But when they decide altogether on the testimony of others, they do so only because the fact to be tried is unsusceptible of any better proof. Their own personal knowledge of the fact, would always be much more satisfactory to themselves, and afford much more certainty of truth and justice. They will not, they cannot — and generally they ought not, to believe or accredit testimony which contradicts the evidence of their senses, or subverts the first principles of human belief. Hence the policy of having a jury of the vicinage; and hence, too, jurors have not only been permitted, but required, to decide on autoptical examination wherever it was practicable and convenient. Cases of this kind are familiar, and not very unfrequent. And cases are not wanting of such examinations having been permitted in suits for freedom. In the case of Hudjins vs. Wrights (supra,) the Court of Appeals of Viiginia sanctioned and sustained a decree in favor of the freedom of the complainants depending altogether on their color, which was ascertained by the Chancellor’s inspection of them in court. And in Hooke vs. Page, 2 Munf. 379, the same tribunal, in a similar controversy in a Court of Law, decided, that a view, by the jurors, of the person claiming to be free, was a proper mode of ascertaining the color of the party. We are supported, then, not only by principle, and reason, and analogy, but by adjudged cases.
Jl white person oj unmixed blood cannot be a slave, here, where there can be no conventional slavery. But, as a person apparently white may, nevertheless, have some African *388 taint, and may, consequently, have descended from a mother who was a slave, the apparent color is but prima facie evidence; and consequently, when a jury, on their view, decide that the color is white, testimony will be admissible to prove that, notwithstanding the visible complexion, there is African blood in the veins sufficient to doom to slavery. Whether there was any such evidence in this case, is another and very different question from that which we have just been considering, and brings up for consideration the second objection to the instruction.
There was positive testimony tending strongly to prove that the defendant was born free; but, if the instruction now under consideration, directed a verdict for her, on the single ground of her being found by the jury, on their inspection, to be a white woman, that instruction cannot be maintained, if there was any evidence tending legitimately to prove, that she was a slave; even though the jury, as may be quite probable, did not believe that she was altogether white, but founded their verdict on the other positive facts; because this Court cannot judicially know the true ground of the verdict, and although, if there be any evidence against her, that in her favor, without inspection of her person by the jury, greatly preponderated; yet the jury had a right to decide on the effect of all the evidence, and should not have been restricted to the single fact of color, if there was any opposing fact entitled to consideration.
If, on inspection, the jury had, without considering other evidence, believed that the defendant was a white woman, they would have been bound by law to have found that she was free, unless the legal deduction from color had been defeated or rebutted by some evidence showing, or legitimately tending to show, that, notwithstanding her apparently white skin, she had some African taint,, and was, de jure, a slave. Some of the plaintiff’s witnesses stated facts conducing remotely to prove that she was born antecedently to the year 1780; but, if she be white,, those facts, if admitted in their fullest effect, could not, in the slightest degree, impair the legal inference from, her complexion. The lapse, of time, and her *389 declaration when she was sold to Courtney, were the only other circumstances which were relied on against her. Her long ostensible submission has already been considered, and we will only add, on this point, the suggestion that the natural answer to the question — why did she acquiesce so long in her servile condition? is, that she was treated and governed as a slave; forced, when an infant, from the country of her birth, and from her kindred and friends, and subjected to the dominion of a master, who made her in fact a slave, she was either kept in ignorance of her rights, or was afraid or unable to assert them.
The fact, that a party held in bondage, and suing lor freedom, had admitted that she was a slave, is entitled to very little weight.' — ■ Vide supra.
Her admission that she was a slave, can be entitled to but very little if any effect. If she was then entitled to be free, her actual subjugation was such duress, in fact and law, as to render what she said ineffectual, as evidence against her. This concession that she was then free, would also show that her acknowledgment was false. And if she was in truth then a slave, her acknowledgment alone could not prove it, because the admissibility of the acknowledgment presupposes that she was a slave when she made it, which is the very fact attempted to be proved by the acknowledgment itself. If, as the hypothetical instruction supposed, she had appeared, on inspection, to be a white woman, the law presumed that she was a free woman; and to repel this presumption, it was not sufficient to prove, that she admitted she was a slave when Courtney bought her; because, before that admission can be availing to any extent, the fact that she was a slave must be proved or assumed. Moreover, her admission, if competent, should have no great influence. It is impossible that she could have had any personal knowledge of the fact that she was born in bondage or in freedom. All that she could know was that she had been, from her birth, treated and recognized as a slave; which fact would be altogether insufficient to defeat the inference from the belief that she was a white woman.
But the instruction, as we understand it, did not confine the jury to the single fact of color. Upon a scrutiny of the whole instruction, we are satisfied that the Circuit *390 Judge intended only to say, and did only say, that inspection by the jury was proper, and that, if after such inspection, they should, upon a consideration of all the facts before them, believe that the defendant was a white woman, they ought to find a verdict for her. And this was certainly right. But, from the whole record, it might be presumed that the jury did not believe from inspection that the defendant was white, and that consequently their verdict was founded on other and amply sufficient evidence.
islheldln'servítude, there is no tations that will recohiS 10 dom: the general" act of limitation does not apply, because the trespass is continued till suit brought; that of iS08only applies where the party was once a slave,and to freedom by^the statute of Pennte in that act. Where a person
be a slave. All born of mothers in slavery in the vank°fsTnce1tie year 17S0, were subject66to'10apprenticeship till their right to en-No one whose mother was lree at his birth, can tire freedom at 28, is not impaired by their being brought to this state before they attain that age.
*390 Wherefore, it seems to us that the instruction was neither erroneous nor prejudicial.
Fourth. As the Court did not essentially err in the Pr°gress °f the trial, and the evidence authorized the opinion that the defendant is free, the plaintiff- in error had no right to a new trial, unless the defendant’s action keen’ as the plaintiff’s counsel contends, barred by some statute of limitations. But the general statute of limitations could not apply, because, if the defendant be . . . rr “ . . , a tree woman, her detention as a slave was a continued trespass to the moment when her suit-was instituted; 1 nor does the special act of 1808 (2 Stat. Law, 1140,) appjy, The defendant does not claim to be free in conseL J quence of any omission, by any person who had a right to ^er services, to comply with any of the provisions of the abolition laws of Pennsylvania; and the statute of 1808 applies only to claims to freedom thus derived, as a forfeiture for non-compliance with the laws of Pennsylvania. She claims to be free because she never was a slave; and there is no statutory limitation to a suit for freedom a mtivitate. Moreover, there is no plea of the statute of limitations.
We deem it proper only to add, on the merits of the case, that, if the defendant’s mother was free at her birth, she herself is necessarily free; and that, if she J 7 7 were born in Pennsylvania since the year 1780, even Plough her mother was a slave, she was, by virtue of the abolition statute of that year, born free, and was only subjected to a state of pupilage until she attained twenty eight years of age; and that, consequently, the fact that sae was brought here, before she was entitled to libera *391 tion from custody, curation, and consequential service, cannot have affected her legal rights as a free person. And, on whatever ground the jury may have found that she was a free woman, as there was evidence to justify such a verdict, and of which the jury were the proper judges, and as there was no error in any opinion given by the Circuit Judge during the trial, this Court does not feel authorized to reverse the judgment and remand the case for a new trial.
Wherefore, it is considered by this Court, that the judgment of the Circuit Court be affirmed.